Case 1:21-cv-00162 Document 24 Filed on 03/31/23 in TXSD Page 1 of 14

United States District Court
Southern District of Texas
**ENTERED**
March 31, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| BENITA RAMOS, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 1:21-CV-162 |
| § | |
| KILOLO KIJAKAZI, § | |
| § | |
| Defendant. § | |

## ORDER AND OPINION

In February 2017, Plaintiff Benita Ramos filed an application for Disability Insurance Benefits and Supplemental Security Income. Since then, two Administrative Law Judges have adjudicated her claims. In October 2018, an ALJ found that Ramos was not entitled to benefits. After exhausting her administrative remedies, Ramos sued the Commissioner of Social Security, and in August 2020, this Court granted her petition and remanded her case for reconsideration.

On remand, a different ALJ held a hearing and then denied her application, concluding that Ramos failed to demonstrate that she had an impairment or combination of impairments that met the applicable standard of "severe". Ramos again exhausted her administrative remedies and then filed this lawsuit. She now moves for summary judgment on her petition for review. (MSJ, Doc. 16) For the following reasons, the Court once again concludes that the ALJ committed reversible error in the analysis of Ramos's claims.

### I. The Five-Step Sequential Evaluation Process

The Social Security Act provides benefits to qualifying individuals with a disability. Under the Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled under the Act, the Social Security Administration employs a "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). At step one, the agency determines whether the claimant is engaged in "substantial gainful activity" during the relevant disability period. *Id.* at § 404.1520(a)(4)(i). If the claimant is engaged in such activity, the agency will find the claimant is not disabled. *Id.* If not, the agency proceeds to step two.

At step two, which is the focus of Ramos's challenge in this lawsuit, the agency considers whether the alleged impairment or combination of impairments is severe, as defined by controlling regulations and caselaw. *Id.* at § 404.1520(a)(4)(ii). If the impairment or combination of impairments is severe, the agency proceeds to step three. Otherwise, the agency concludes that the claimant is not disabled and ends the analysis. *Id.*

In step three, the agency determines whether the claimant has "an impairment(s) that meets or equals one of [the agency's] listings . . . and meets the duration requirement" of at least twelve months. *Id.* at § 404.1520(a)(4)(iii). If a claimant's impairment qualifies, the claimant is disabled, and the inquiry ends. *Id.* at § 404.1520(d). If not, the agency proceeds to step four.

At step four, the agency evaluates the claimant's "residual functional capacity and [] past relevant work." *Id.* at § 404.1520(a)(4)(iv). If the claimant can still perform past relevant work, the claimant is not disabled. *Id.* If the claimant cannot perform past relevant work, the agency proceeds to the last step.

Finally, at step five, the agency considers whether in light of the claimant's "residual functional capacity and [] age, education, and work experience", the claimant can "make an adjustment to other work." *Id.* at § 404.1520(a)(4)(v). Unlike in steps one through four, the burden is on the Commissioner at step five. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). If the agency determines that the claimant can perform other work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot perform other work, the agency will find the claimant disabled. *Id.*

## II.    Procedural History

On February 16, 2017, Ramos first applied for Disability Insurance Benefits and Supplemental Security Income, alleging February 6 as the effective date of disability. (Application Summary, Doc. 12-7, 2) The Social Security Administration denied her claim, and then confirmed its decision on Ramos's motion for reconsideration. (Admin. Tr., Doc. 12-5, 14, 40) Since then, two ALJs have considered Ramos's claims.

### A.  First ALJ Ruling

In October 2018, after conducting a hearing a few months earlier, an ALJ issued the first ruling on Ramos's claims.  At step one, the ALJ found that Ramos had not engaged in substantial gainful activity for a qualifying disability period. (2018 ALJ Decision, Doc. 12-3, 69) At step two, the ALJ found that Ramos suffered the following severe impairments: "osteoarthrosis of the left knee, degenerative joint disease of the left hip, cervical stenosis, lumbar radiculopathy, anxiety, and depression." (*Id.*) At step three, the ALJ found that Ramos did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments". (*Id.*) Based on this finding, the ALJ proceeded to steps four and five.  The ALJ determined Ramos's residual functional capacity and concluded that she could still perform some jobs. (*Id.* at 71, 74–75) As a result, the ALJ denied her application.

Ramos presented her claims to the Appeals Council, which denied her request. (Notice of Appeals Council Action, Doc. 12-3, 15)  Ramos then filed suit in federal court, seeking review of the Commissioner's decision denying her benefits.  Adopting a Magistrate Judge's Report and Recommendation, this Court granted Ramos's petition because the ALJ, in determining Ramos's residual functional capacity, had rejected the opinions of Ramos's doctors as well as those of the state agency medical consultants, ultimately and erroneously reaching "his own conclusion as to the effect of Ramos's impairments." (R&R, Doc. 12-14, 18; *see* Order Adopting R&R, Doc. 12-14, 2) The Court remanded the case to the Commissioner for further proceedings. (*Id.*)

### B. Second ALJ Ruling

In May 2021, Ramos received a new hearing before a different ALJ. (ALJ Decision, Doc. 12-13, 5) Two months later, the ALJ denied her application. (*Id.* at 16)

In the step one analysis, the ALJ found that from February 2017 through May 2019, Ramos had not engaged in substantial gainful activity. (*Id.* at 8) Beginning in May 2019, however, Ramos had begun to care for her mother as a home health provider. The ALJ focused on these services to conclude that Ramos "worked after the alleged disability onset date, and that this work activity rises to the level of substantial gainful activity between May 2019 and March 2021." (*Id.* (citation omitted)) The ALJ made no express findings regarding whether Ramos had engaged in substantial gainful activity between April 2021 and July 14, 2021, the date of the decision.

Given her findings at step one, the ALJ engaged in the step two analysis solely for the February 2017 through May 2019 time period. The ALJ considered Ramos's testimony, the records of physicians who examined her, and the opinions of state agency medical consultants. The ALJ afforded "great weight" to the state agency consultants' opinions, explaining that they based them "on a thorough review of the available medical records as well as a comprehensive understanding of agency rules and regulations", and that their opinions were "thoroughly consistent with the claimant's abilities to care for her mother and her return to work in May 2019". (*Id.* at 14) As to the opinions of treating physician Michael Eisen and therapist Jose C. Mena, the ALJ afforded them "little weight", noting that Dr. Eisen's treatment occurred over the "rather limited" period of "only two months", and Mena's opinions lacked "direct support" in the record. (*Id.* at 15–16)

The ALJ ultimately found that Ramos's "medically determinable impairments could reasonably be expected to produce" the symptoms of which Ramos testified. (*Id.* at 10) The ALJ concluded, however, that Ramos's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent". (*Id.*) And based on consideration of "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent

with the objective medical evidence and other evidence", the ALJ determined that Ramos's impairments or combination of impairments did not qualify as severe. (*Id.* at 9 (citing 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016)))  This conclusion led to the denial of Ramos's claims.

Ramos exhausted her administrative remedies and then filed this action.  She now moves for summary judgment. (MSJ, Doc. 16)

### III. Analysis

In her Motion, Ramos presents the following three issues, claiming that each one requires remand: (1) the ALJ failed to properly apply the Fifth Circuit's *de minimis* standard for disability in the step two analysis; (2) the ALJ failed to consider all relevant time periods, resulting in an unadjudicated period spanning April 2021 through July 14, 2021, the date of the ALJ's ruling; and (3) the ALJ and Appeals Council judges lacked proper appointment and had no legal authority to adjudicate her case.  The Court begins with this third contention, as the Court cannot uphold the ALJ's decision unless she had the authority to reach it.

#### A. Appointment Power of Acting Commissioner Nancy Berryhill

On July 16, 2018, Acting Social Security Commissioner Berryhill ratified the appointment of the SSA's then-serving ALJs and judges on the Appeals Council, who SSA staff members had previously appointed.  Berryhill took this step in response to the Supreme Court's holding that the Securities and Exchange Commission's ALJs were "Officers of the United States" that, in accordance with the Appointments Clause, must be appointed by the president, a court of law, or a head of department.  *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018).  In response to *Lucia* and "[t]o address any Appointments Clause questions involving Social Security claims," Berryhill ratified and approved the then-serving ALJs and Appeals Council judges "as her own".  Notice of Social Security Ruling, 84 Fed. Reg. 9582, 9583 (Mar. 15, 2019).

Ramos contends that when Berryhill took this action, her tenure as Acting Commissioner had lapsed and, as a result, she lacked the authority to ratify the appointments.

The Federal Vacancies Reform Act provides that an acting official like Berryhill may serve "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. §§ 3346(a)(1)–(2). For "any vacancy that exists during the 60-day period beginning on a transitional inauguration day," such as the SSA Commissioner vacancy, the 210-day period does not begin to run until 90 days after the vacancy occurs. 5 U.S.C. § 3349a(b). The parties agree that Berryhill began serving as Acting Commissioner on January 21, 2017, and that her 210 days of service under Sections 3346(a)(1) and 3349a(b) ended on November 16. They further agree that on April 17, 2018, President Donald Trump nominated Andrew Saul as the Commissioner of SSA. Upon the nomination of Saul, Berryhill resumed her position as Acting Commissioner during the pendency of his confirmation process, and it was during this process that Berryhill ratified the appointment of the ALJs and Appeals Council judges.

Ramos argues that because Berryhill had completed 210 days of service as Acting Commissioner by November 2017, she could not resume serving as Acting Commissioner in 2018 upon Saul's nomination. She relies on *Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615 (D. Minn. 2022), which held as much, and notes that she "offers the exact same arguments here as the claimant in that case". (MSJ Brief, Doc. 17, 19)

The Eighth Circuit, however, has since reversed the district court's decision in *Brian T. D. See Dahle v. Kijakazi*, 62 F.4th 424, 429 (8th Cir. 2023). And even before it was reversed, *Brian T. D.* represented an outlier. Like the Eighth Circuit, district courts considering the same issue have concluded that the FVRA's use of the word "or" in Section 3346(a) "enabled [Berryhill] to resume her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018." *Seago v. Kijakazi*, No. 1:21-CV-136, 2022 WL 17853369, at *6 (S.D. Tex. Nov. 15, 2022), *report and recommendation adopted*, No. 1:21-CV-00136, 2022 WL 17852795 (S.D. Tex. Dec. 22, 2022) (quoting *Thomas S. v. Comm'r*, No. C21-5213-MAT, 2022 WL

268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022)); *see also Brent Z. v. Kijakazi*, No. 22-CV-511 (JWB/JFD), 2023 WL 1110449, at *10 (D. Minn. Jan. 30, 2023), *report and recommendation adopted*, No. CV 22-511 JWB/JFD, 2023 WL 2414594 (D. Minn. Mar. 8, 2023) (collecting cases concluding the same). This Court agrees. Upon the nomination of Saul, Berryhill possessed the statutory authority to resume her role as Acting Commissioner, which means that she had the power in July 2018 to ratify the appointment of the ALJs and the Appeals Council judges, including the ones that considered Ramos's case.

### B. Application of the *De Minimis* Standard

Satisfied that the ALJ possessed the authority to issue her decision, the Court now turns to the contents of that decision. A district court reviewing the Commissioner's denial of a claimant's benefits application ascertains only "whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Salmond v. Berryhill*, 892 F.3d 812, 816–17 (5th Cir. 2018) (quoting *Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017)). The court does "not 'reweigh the evidence in the record, try the issues *de novo*, or substitute [its] judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.'" *Id.* at 817 (quoting *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)). "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Id.* (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004) (quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)).

In determining severity at step two, "[s]evere impairment has a specific—if somewhat surprising—meaning. Under [Fifth Circuit] precedent, '[a]n impairment can be considered as not severe *only if* it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Salmond*, 892 F.3d at 817 (emphasis in original) (quoting *Loza*

*v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000)); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). This severity analysis functions as a screening device, requiring only that "the claimant [] make a *de minimis* showing." *Salmond*, 892 F.3d at 817; *Anthony v. Sullivan*, 954 F.2d 289, 293 n.5 (5th Cir. 1992) (citing *McDonald v. Sec'y of Health & Hum. Servs.*, 795 F.2d 1118, 1122 (1st Cir. 1986)).

To facilitate review of an ALJ's decision, the Fifth Circuit in *Stone v. Heckler* expressed that it would "assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect". *Stone*, 752 F.2d at 1106. But remand does not occur "simply because the ALJ did not use 'magic words.'" *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Rather, a district court remands the matter "only where there is no indication the ALJ applied the correct standard." *Id.*

In 2021, the Fifth Circuit considered whether the language of Social Security Ruling 85-28 represented an adequate articulation of the *Stone* standard. *See Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021). The SSA issued SSR 85-28 shortly after *Stone* was decided, "to clarify that SSA's policy is consistent with various court decisions", including *Stone*. SSR 85-28, 1985 WL 56856, at *2 (1985). That SSR provides that an impairment or combination of impairments is not severe if "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered". *Id.* at *3. In *Keel*, the Fifth Circuit considered the language of SSR 85-28. The court noted that the language was not identical to the *Stone* standard, but concluded that the language was "not substantially different enough . . . to warrant a finding of error." *Keel*, 986 F.3d at 556.

In the current matter, the ALJ did not cite to or quote the language in *Stone*. When summarizing the applicable law, however, she referenced SSR 85-28 and utilized the language of its Policy Clarification—i.e., "An impairment or combination of impairments is 'not severe' when

medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work". (ALJ Decision, Doc. 12-13, 6)  Taken at face value, the ALJ Decision sets out the appropriate standard.

But a review of that ruling reflects that the ALJ did not apply her correct articulation of the *de minimis* standard.  First, the ALJ did not repeat this language within her Findings of Fact and Conclusions of Law.  For example, she concluded that Ramos "does not have an impairment or combination of impairments that has *significantly limited* (or is expected to *significantly limit*) the ability to perform basic work-related activities for 12 consecutive months".  (ALJ Decision, Doc. 12-13, 8 (emphasis added))  Then, after defining basic work activities, she repeated this language:

> In reaching the conclusion that the claimant does not have an impairment or combination of impairments *that significantly limits* her ability to perform basic work activities, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]

(ALJ Decision, Doc. 12-13, 9 (emphasis added))  In essence, while the ALJ articulated the appropriate *de minimis* standard within her general recitation of the law, she repeatedly referenced the more stringent "significantly limits" language when actually applying the law to the facts of the case.

In addition, the record raises significant doubts about the focus of the ALJ Decision, and demonstrates that substantial evidence does not support a finding of no severe impairments or combination of impairments.  First, ample evidence supported Ramos's position that the identified impairments had more than a minimal impact on her ability to engage in basic work activities.  As the ALJ Decision itself summarizes, Ramos testified to numerous limitations, such as not being able to sit for more than 15 minutes at a time, comfortably lift more than two and half pounds, open bottles, or make a fist.  She claimed that she could cook only frozen meals in the

microwave. And she rated her pain at 8.5 out of 10, with medication. (ALJ Decision, Doc. 12-13, 10)

The ALJ found Ramos's testimony "not entirely inconsistent", but at most, Ramos appears to have acknowledged that some of her symptoms had alternative causes, such as her need to take naps in the afternoon stemming from her need to wake up early to take care of her mother. (*Id.*) Overall, Ramos's testimony consistently described a litany of symptoms that limited Ramos's daily activities, and would be expected to have more than a minimal effect on her work activities, especially as a home health provider.

In addition to Ramos's testimony, her treating physicians provided substantial evidence corroborating her impairments and their impact. In support of her application, Ramos submitted documentation from six doctors and one clinical social worker. A brief summary of their observations and conclusions demonstrates that Ramos exceeded the *de minimis* showing of severity.

First, in 2017, Ramos's primary care physician, Dr. Raquel Bolado, took X-rays of Ramos's spine—revealing degenerative disc disease, osteoarthritis, and spurs. (Admin. Tr., Doc. 12-9, 61) Dr. Bolado diagnosed Ramos with cervical spondylosis with radiculopathy and bilateral leg pain. (*Id.* at 64–65) Further physical examination revealed decreased range of movement in her spine, and MRIs revealed severe central canal stenosis, severe right neuroforaminal stenosis, and central disc protrusion. (Admin. Tr., Doc. 12-10, 48) Dr. Bolado referred Ramos to Dr. Victor Pallares. (*Id.* at 36)

That same year, when Dr. Pallares saw Ramos, he observed that Ramos was "suffering from severe pain." (*Id.* at 40) He noted that she exhibited limited range of motion due to pain and described her "functional status" as "poor". (*Id.* at 39–40)

Additionally, in 2017, Ramos began seeing licensed clinical social worker Jose C. Mena biweekly for psychotherapy. (Admin. Tr., Doc. 12-9, 88) Mena indicated that Ramos had been diagnosed with major depressive disorder and had little to no ability to "[c]omplete a normal

workday and workweek without interruptions from psychologically based symptoms". (*Id.* at 89) He expressed similar concern for her ability to "[d]eal with normal work stress". (*Id.*)

In December 2017, Ramos also saw a neurosurgeon, Dr. Alejandro Betancourt. Dr. Betancourt observed Ramos's limited range of motion in her shoulder joint and noted numbness and weakness in her hands, as well as a herniated disc. (Admin. Tr., Doc. 12-10, 52) He diagnosed her with spinal stenosis and recommended surgery. (*Id.*)

The following year, in February 2018, Ramos saw sports medicine specialist Dr. Michael Eisen for her knee pain. Dr. Eisen noted knee weakness, joint pain, swelling, and atrophy of the vastus medialis obliquus. (Admin. Tr., Doc. 12-9, 86) X-rays revealed mild to moderate medial joint space narrowing, and an MRI showed degeneration of the medial meniscus. (*Id.*) Dr. Eisen recommended physical therapy. (*Id.* at 86–87)

One month later, Ramos saw Dr. Surya Raguthu. Ramos informed Dr. Raguthu that although she had received steroid injections in her left knee and left hip, she had experienced little relief. (Admin. Tr., Doc. 12-10, 6) Dr. Raguthu noted that Ramos exhibited limited range of motion in her spine, hip, and left knee, and further observed diminished strength, sensation, and reflexes in Ramos's hamstrings and hips. (*Id.*) He diagnosed her with lumbago with sciatica on the left side, weakness of the left lower extremity, and sacroiliac joint pain. (*Id.* at 8)

Finally, in February 2019, Ramos saw another neurosurgeon, Dr. Madhavan Pisharodi. Dr. Pisharodi noted Ramos's limited range of motion for lateral bending in the spine and, after an MRI, diagnosed her with severe spinal stenosis. (Admin. Tr., Doc. 12-21, 30–31) Like Dr. Betancourt, he also recommended surgery. (*Id.* at 27)

The ALJ in her Decision discusses these physicians, but her analysis of their opinions reveals that she required them to demonstrate that Ramos had suffered *significant* limitations in her work activities, rather than show more than "such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." At times, the ALJ selectively summarized the physicians'

opinions. For example, the Decision notes that Dr. Pallares "did not prescribe any treatment", (ALJ Decision, Doc. 12-13, 10), but makes no mention of his observation that Ramos exhibited limited range of motion due to pain and described her "functional status" as "poor". (Admin. Tr., Doc. 12-10, 39–40) On other occasions, the ALJ summarized the significant impairments that the physician diagnosed, but minimizes the evidence as depicting only a "mild" or "moderate" level symptom. (*See, e.g.*, ALJ Decision, Doc. 12-13, 11 (describing Dr. Eisen as observing only "mild antalgic gait" and "mild to moderate media video from no joint space narrowing without secondary findings")) In the end, the ALJ focused on "the significant gap in treatment", Ramos's "failures to follow prescribed treatment", and "significant relief with injections, as well as some relief with medications." (*Id.* at 12) But even if true, these findings do not controvert the physicians' opinions, which corroborated Ramos's testimony of more-than-minimal limitations. For example, an individual can experience significant relief with injections, and still suffer from an impairment that has more than a minimal impact on the person's ability to work. The overall tenor of the ALJ Decision reveals a search for significant limitations, rather than an assessment of whether Ramos had demonstrated more than minimal limitations. By analyzing the evidence in this fashion, the ALJ erred.

Likewise, the ALJ's reliance on the state agency medical consultants was misplaced. Three consultants gave opinions in this matter, including two non-treating physicians and one psychological expert. The ALJ ascribed "great weight" to their opinions, even though they had reviewed only Exhibits 1F and 2F, which covered the time period of May 2016 through May 2017. In other words, these consultants based their opinions on medical records that ended in May 2017, even though the period of alleged disability extended through May 2019. While an ALJ may assign weight to competing evidence, she cannot come to her own conclusions based on the raw medical records. *See Salmond*, 892 F.3d at 818 ("[A]n ALJ should not substitute his lay opinion for the medical opinion of experts". (quoting *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000))); *Gerardo O. v. Kijakazi*, No. 3:22-CV-00155-X-BT, 2023 WL 2144163, at *3 (N.D. Tex. Jan. 31,

2023), *report and recommendation adopted*, No. 3:22-CV-155-X-BT, 2023 WL 2142972 (N.D. Tex. Feb. 20, 2023) ("ALJs are directed to resist the urge to . . . make independent assessments of raw medical data".). But that is exactly what occurred. The state agency consultants could express opinions as to Ramos's alleged disabilities only through May 2017; they had no basis to offer opinions beyond that date, and in reality, they offered no such opinions. In contrast, the medical records on which the ALJ relied for the Decision dated from November 2017 to March 2019. The state agency consultants did not review *any* of those medical records, yet the ALJ relied on those consultants' opinions to discredit the physicians who submitted evidence after actually treating Ramos during the period of alleged disability. In essence, for the period of November 2017 through March 2019, the ALJ reached her own conclusions based on the raw medical data.

Ramos more than met her burden to present evidence of her conditions' severity sufficient to show that during the disability period, she experienced symptoms that exceeded "a slight abnormality having such minimal effect on an individual that *it would not be expected to interfere* with the individual's ability to work, irrespective of age, education or work experience." *Loza*, 219 F.3d at 392 (emphasis removed and added). It is apparent from the Decision that the ALJ held Ramos to a higher standard, requiring her to show significant limitations in her ability to work. In doing so, the ALJ applied the incorrect legal standard. Her conclusion that Ramos did not suffer from a severe impairment or combination of impairments is not supported by substantial evidence.

Unless an ALJ proceeds past step two, failure to properly apply the *de minimis* standard is an error that generally requires remand. *Compare Stone*, 752 F.2d at 1106 ("Unless the correct standard is used, the claim must be remanded to the Secretary for reconsideration."), *with Keel*, 986 F.3d at 556 ("Even if we were to conclude that the ALJ failed to properly apply the *Stone* standard, such a conclusion does not require an automatic reversal—if the ALJ proceeds past step two, we consider whether the error was harmless."). In the present matter, the ALJ stopped her analysis after step two. Accordingly, remand is the appropriate remedy.

## IV.     Conclusion[1]

For the reasons stated above, it is:

**ORDERED** that Plaintiff Benita Ramos's Motion for Summary Judgment (Doc. 16) is **GRANTED**;

**ORDERED** that Plaintiff Benita Ramos's Petition for Review of the Denial of Disability Benefits is **GRANTED**; and

**ORDERED** that this case is **REMANDED** to the Commissioner of Social Security for further hearings not inconsistent with this Order and Opinion.

The Clerk of Court is directed to close this case.

Signed on March 31, 2023.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge

---

[1] In light of the Court's ruling and the resulting remand, it is unnecessary to reach Ramos's third ground in her Motion—i.e., that the ALJ failed to consider all relevant time periods, resulting in an unadjudicated period spanning April 2021 through July 14, 2021.